today and tomorrow. We have a robust array of cases this morning. I think hopefully you're veterans of this procedure but just to make sure. A number of these cases have a lot of issues in them and so when you have a green light you've got full run but when you get the amber light if you're still on point one you might want to shift gears at least to try to give us some sense of whatever other point that you wanted to make and there probably be a lot of questions and so please be responsive to that. Other than that I sort of have a bad habit of leaning back and not being in the mic where I can be heard which is bad so I'm going to encourage you to stay in the microphone so that you can be heard but more specifically we do record the arguments and so if you get away from the mic as I am want to do you won't be properly picked up for it. So other than that we'll call the first case United States et al. versus State Farm. Mr. Copley you're up. Good morning Your Honors. May it please the Court. My name is William Copley and I'm here on behalf of the appellants and cross appellees in this matter. Relators Corey Rigsby and Kerry Rigsby. Your Honor the district court below was correct to uphold the jury verdict in my client's favor holding that State Farm knowingly violated the False Claims Act with respect to their example Macintosh claim but it erred when it applied Rule 9b post trial to my client's complaint to deny them an opportunity to pursue other instances of fraud within State Farm's proven scheme. The district court's decision below was unprecedented in two important ways. First it is the only court that is required a relator to prove an example claim at trial as a prerequisite to discovery regarding other instances of fraud within the same scheme. Then after the court after my client successfully carried that unprecedented burden the court became the first court post trial to look at a relator's complaint see that a relator had both adequately pled a scheme and an example claim and then nevertheless hold that they were not entitled to discovery regarding other instances of fraud within that same scheme. I want to focus today on explaining why the district court correctly upheld the trial verdict but it erred in its post trial scope ruling and I want to start your honor by focusing on two arguments that State Farm really focused upon in its reply brief. First was this argument that the judge the district court and the jury should have ignored the evidence that State Farm coerced engineers to change engineering reports because it received those engineering reports after it paid the McIntosh claim. Your honor that argument ignores both the plain language of the False Claims Act and how the NFIP operates. Section 3729 A1 doesn't just prohibit the submission of false claims for payment it prohibits the submission of false claims for payment or approval and the poor for approval language is in there for programs just like the NFIP. In the NFIP what happens is State Farm and other insurers issue insurance policies on behalf of the federal government that collect premiums. Those premiums go into a fund and it uses that fund. Let me stop because I think you're not gonna get there with time. We've got it in terms of how the program works, what the FCA provides, etc. If you're starting off as your lead argument and apparently strongest one this abuse of discretion argument that the district court denied you, further discovery, etc., that's not necessarily where I would have thought you were starting but since that's where you are, cut to the chase in terms of this whole spiel of evidence of why that's an abuse of discretion given the history of this case, all the stuff at the Scruggs firm and all the rest of this. You cut to the chase, bullet point as to why this was a 9B abuse of discretion in the face of your bellwether jury verdict on this claim but what it is that just speaks so clearly that this discretionary move by the district court to let you just go unfettered out here in all these other cases. All right, Your Honor, let's turn directly to Grubbs. The first point I would make is that I do not believe this is an abuse of discretion standard. The district court did not rule as to what discovery my clients could get to prove a claim. They ruled what claims my client could pursue. So I believe this is exactly the same issue that was at issue at Grubbs where they held that the ruling is a review de novo. This isn't a matter that the court has discretion on what claims a party can pursue and the district court expressly based its ruling on its interpretation of Grubbs and Rule 9B. So, Your Honor, I think it's absolutely clear that whether or not the district court got right what Grubbs means, whether or not the district court got right what 9B means is exactly the sort of pure legal issue that this court reviews de novo. So it should not be an abuse of discretion. But let me turn specifically as to why the district court's decision is irreconcilable with Grubbs. The district court, State Farm, and the relators all agree that Grubbs controls in this case, but we disagree about what it means. In particular, the district court seized on this court's reliable indicia language, but it misconstrued it to require that a relator must plead not only the details of an example claim, but each claim they want to pursue at trial. This was irreconcilable with Grubbs in three important ways. First, Grubbs makes clear that a relator can satisfy Rule 9B by example. This was apparent from the very standard that Grubbs laid out. It said that a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme paired with reliable indicia that lead to a strong inference that false claims were submitted. In Grubbs, it held that the relator satisfied that because it pled one overt act by each doctor. Dr. Grubbs didn't stop practicing medicine and go around with the clipboard writing down whether or not each of his fellow doctors at the hospital did a face-to-face visit on each day. What he set forth was an overt act, one overt act by each doctor, and then the court held that he would be entitled to discovery regarding the defendant's files. So you could look at the patient's records, and then you could compare them to the bills that were submitted to the government and see whether or not that the face-to-face visit had occurred. I know you said you had three things to tell us. I may be stopping you too soon. But the problem with me, with Grubbs, Judge Higginbotham, towards the end, a little bit later than the opposing counsel, we leave to the able district court to manage the access of discovery targeted to the claims made and not to claims still being searched for. What have you shown so far in this exemplar trial that would limit where discovery would go? Yes, Your Honor. And I believe that the district court, if you look to the district court's August 9th or August 2009 opinion, it had a limiting principle. When it originally denied State Farm's motion to dismiss, it set the parameters of the case based on the scheme we had outlined and based on the example claim. It was claims that did not comply, did not meet the requirements of the controlling FEMA directive, W-5054, for exemption, where State Farm nevertheless used its expedited procedure, the exact total procedure, and where it hit the limits of the NFIP flood program. That was taken directly from the allegations of our scheme and also from the example claim. And I believe that would be a good place to start, Your Honor, for the scope of these claims. Because if you look at the scheme evidence of this case, it was all about the protocol that State Farm put in place to adjust these claims. It was about State Farm telling its adjusters not to try to discern wind from flood damage, that Katrina was a flood storm, not a wind storm, that if they saw obvious wind damage, they could pay that. But otherwise, they weren't to try to distinguish, because State Farm said they're going to send an engineer after the fact to make that determination. Leckie King, the head of State Farm's NFIP program, testified that the reason they hired engineers was to make sure they paid the correct amount under each policy. That's at page 23217 of the record. Did you ask the district court for specific discovery, or was this just a general ruling that we're not going to go forward anymore with the case? It was a general ruling that we're not going to go forward anymore. We never, well, we did file a, post-trial, we filed a motion saying we should be now be allowed to go forward as the district court had originally intended, and it's August 2009 ruling. But you never specified whose depositions you wanted or what records. It was just generally, let's go forward with discovery. Yes, Your Honor, because we never had an indication that we needed to submit that, given the court's prior August 2009 ruling. Well, if you were to get back to the district court, what were you going to isolate? I mean, I do think, you know, you've got these engineering reports, you've got these employees who you claim are being coerced, you've got these statements, you've got the use of the different software. I mean, it does seem to me it's, you know, it's a plausibility standard the district court used. I mean, it does seem to me it's hard to believe all that would have been done, and we have to accept your allegations as true, and you've actually proven some of them at a bellwether trial. It seems hard for me to believe, and it certainly means nothing to State Farm. But how, I mean, if you get back, how are you gonna figure out what other claims you can actually prove up? It seems like a difficult task. Well, Your Honor, I think what you would have to do is you have to look at, first of all, the evidence, right? You've got, for that claim, did they use exact total when they weren't supposed to? And so that's a good start. And then you've got, what standard did the adjusters do? What did the adjusters do in the file to, to actually prove up the damages they're saying, or at issue, or that justify a payment under the flood claim? So it's going to require a file-by-file review, Your Honor, to look at and identify those claims. This is no different than Grubbs. This is no different than Grubbs allowing Dr. Grubbs to go through the patient medical records and see, for each patient, was there an actual in-person visit in the file, and comparing that to the billing records. We need to do a very similar process, Your Honor, with these claims. And, and the key point to remember here, Your Honors, is the district court, when it upheld the jury verdict below, laid out a bunch of evidence of the specific acts by State Farm, the changed engineering reports, the protocol that employed telling the adjusters they could use exact total rather than doing a line-by-line adjustment, not determining themselves whether or not wind or flood had caused the loss. Every fact that the district court relied upon to establish State Farm's state of mind, to uphold the jury verdict, dealt with conduct that was systematic by the district court, I mean, systematic by being grappled with the central issue in Grubbs of whether or not all of that reliable, all of that information, all of that systematic conduct, constituted reliable indicia. There's no way it can, it can be sufficient to establish State Farm's state of mind, and insufficient to establish reliable indicia that false claims were created. And I think this gets to a central point, and this was sort of the second main point that I was going to get to as to why the district court's ruling is irreconcilable with Grubbs, is that what Grubbs held was it rejected the then-majority rule that required a relator to plead the details of even an example claim to get access to discovery regarding other instances of fraud within the scheme. It held that that would stymie legitimate efforts to expose fraud, and the reason it did that is because it recognized the heart of an FCA claim is not the details of the bill, it's the how and the why that bill is false. It's exactly what the court was talking about when it talked about the hand in the cookie jar, and how knowing the hand is in the cookie jar doesn't mean anything, divorced from knowing whether or not the chore was done. It's talking about this exact same thing. It knows Dr. Grubbs can't stop practicing medicine and follow all the other doctors around the hospital, and so it said that Dr. Grubbs' knowledge of the scheme, because he was recruited to it by other doctors, and the fact that he confronted the hospital administrator, said there is a scheme here that is causing false bills to be presented, and he may not know on which day which patient got a face-to-face visit, but he knows what's going on, and so the court wanted to create an alternative mechanism, an alternative path, that a relator could use to show, to show, to satisfy Rule 9b by showing reliable indicia that false claims were submitted, and it held that you can find, specifically that you can find that reliable indicia in the details of the schemes itself. Does what the suggests that the claims that are being submitted to the government was false. What the Disha court did, though, is it took that reliable indicia language, what was meant to be a reasonable alternative path for a relator to prove, to establish that there were fish in the pond, so to speak, to use its analogy, and he turned it on its head. Rather than being an alternative to providing the details of an example claim, the court misconstrued reliable indicia as requiring the relator to prove that there were fish in the pond, and that's what the Disha court did. I'm assuming, in a case of this magnitude, there was humongous, you know, discovery, I mean, depositions, the whole kazoo. The evidence at trial seemed to be sort of rifle-shotted, i.e., the McIntosh claim. My question to you is that back in the discovery period, the depositions, if, for example, in developing the McIntosh claim and examining the adjuster, whoever the perpetrator is, assuming that they were asked about other claims, et cetera, et cetera, but for tactical purposes, you move ahead with McIntosh. Then I could see, okay, within the body of discovery, you can say, we didn't develop these, but out of these witnesses, we extracted that they use the same method with this, da-da-da-da-da. I could see more clearly than that kind of the pattern, though not fleshed out about other claims, as opposed to proving up with the rifle shot, the McIntosh claim, and then extrapolating because that's proven, there must be, have to be other claims out there, and we need just a general check to go. Do you follow what I'm saying? I'm asking you, is there anything sort of in the body of work developed in this case that would have led the district court in Alta to see, you know, there's got to be other, because we've at least touched first and second base on those, versus just want to argue, we proved so strongly this case, it must necessarily mean that we get under grubs to go look elsewhere. Do you follow the line of thinking? I think I do, Your Honor. The first point I need to make is the district court expressly precluded us from taking discovery regarding how any claim was adjusted other than McIntosh. Okay. So we were never given the opportunity to develop that evidence. Okay. The second point I would make, though, is despite that limitation, we established that each of the pieces of evidence that support the McIntosh claim were systematic. It wasn't just Kerry Rigsby who was told that Katrina was a flood storm and that the winds weren't strong enough to cause damage to homes. It wasn't just Kerry Rigsby who was told, don't try to distinguish flood versus wind damage, we're going to send an engineer to do it. And then, and we also established it wasn't just with the McIntosh claim where there were changed engineering reports. Your Honor, we established that there were And that she said these all say when they all have to go back. So, Your Honor, when you take all of that in combination, we believe that there was more than sufficient reliable indicia that false claims were submitted to support further inquiry into the other instances of fraud within state farms. All right. In order to grant you relief on that point, are you asking us to extend GRUBs or are you asking us to apply GRUBs differently but on this same scenario? Your Honor, I believe that under a straightforward application of this court's precedent, a reversal is required because the district court's ruling that you had to plead details not only of an example claim but of each claim and that was the only thing the court held was missing for reliable indicia is the exact opposite of what this court accomplished in GRUBS. I thank this court for its consideration. Thank you, sir. You've reserved time for rebuttal. I did, Your Honor. All right. Mr. Pulliam? Thank you, Chief Judge Stewart, and may it please the Court. The United States appears as amicus to address the legal question of whether a relator's failure to comply with the seal requirements in Section 3730B2 requires automatic dismissal of the relator's key TAM complaint. The district court correctly concluded that it does not. All right, Mr. Pulliam. We need your theater voice. I'm sorry? We need your theater voice. I will do my best. Nothing in the text of the statute requires dismissal. It does not specify any consequences for failure to comply, nor does it make adherence to the seal requirement a condition precedent of initiating or maintaining suit. In the absence of such statutory direction, district courts typically have discretion to determine whether violation of a procedural requirement requires dismissal of the suit, and that is true with respect to seal violations as well. Recognizing that discretion in this context also supports Congress's purposes behind the seal requirement. In enacting the requirement, Congress sought to balance its overall goal of encouraging private litigation under the False Claims Act with its concerns for the government and enforcement interests. Now, permitting a relator to file a complaint but requiring the complaint to be filed under seal protects the relator's litigative rights while providing the government an opportunity to evaluate the claims, determine whether it is already investigating the alleged fraud, and decide whether to intervene in the action. A flexible rule permits a court to maintain that balance in light of the specific circumstances presented by a case. An inflexible rule requiring automatic dismissal, in contrast, frustrates the interests that Congress sought to further. For example, in a case where the violation is inadvertent and minor and no harm to the government has resulted, a dismissal frustrates the purpose of encouraging private litigation where not necessary to vindicate the government's investigative and enforcement interests. How would you categorize this violation minor and inadvertent? Well, the government has taken no position on the application of the factors in this case. What's your view on whether the, is it a violation just to discuss the facts or do you have to discuss the existence of the lawsuit? We believe that the district court was correct with respect to its conclusion that a violation consists of disclosing the existence of a lawsuit. Just disclosing the facts underlying the allegations of fraud would not constitute a violation of the SEAL requirement. The Fourth Circuit held that directly in its ACLU v. Holder decision, where it considered a First Amendment challenge to the SEAL requirement, and it relied on the scope of the SEAL provision, as we've just discussed it, to hold that the SEAL requirement. So it's a very flexible approach. As you're brief, I'm trying to recall, identify a specific standard or characterization of the range of options that you would endorse? Well, we identified three factors that we believe a district court should consider when deciding whether dismissal is an appropriate sanction. Those three factors are whether there's been harm to the government, the extent of the SEAL violation, and whether the conduct was willful or in bad faith. Your Honor asked about the range of options that a district court might have. We do believe that the background principle that district courts have, discretion to fashion a sanction appropriate to misconduct, would apply here. And a district court could rely on the various sources of authority that it uses in other contexts to fashion another sanction if it thought that dismissal was excessive, but that some sort of sanction were appropriate. So, as I mentioned, we believe the Ninth Circuit's opinion in Lujan is instructive, and that the three factors that the Ninth Circuit identified capture the most relevant criteria that a district court should consider when determining whether dismissal is an appropriate sanction. We urge the court to join the Ninth Circuit in adopting this flexible test, and hold that the False Claims Act does not require dismissal automatically when a relator fails to adhere to the SEAL requirements. If the court has no further questions, the government will rest on its brief. Thank you very much. All right. Mr. Robinson. May it please the Court, I'm Barney Robinson for State Farm. I'd like to just lay a picture here before I get into the specifics of these claims. This is undisputedly a waterfront house, the McIntosh House, at the end of a peninsula. It was adjusted using the normal method of we adjust wind, top-down, water damage, bottom-up. There were only two adjusters. One of them was the relator, Ms. Rigsby, Carrie Rigsby. The other was Cody Perry. They were both FEMA certified flood adjusters. They spent many hours doing a detailed, scoped investigation of the property. There was more than $250,000 in flood damage to that property. There's only one other person involved in the decision to pay that claim, and that was Mr. John Concer, who was a State Farm supervisor. That decision was made by Mr. Concer on the unanimous recommendation of Ms. Rigsby, the relator, and Mr. Perry on October 2. There was no proof at trial that any other person was involved in making that decision. So if these three individuals did not know, which is the standard under the False Claims Act, that there was not $250,000 or more flood damage on October 2, then there's inadequate center. Now what did FEMA tell them to do? FEMA said what you need to do, and this was in an August 31, 2005, policy memo, DS-300, that there's an urgent need to expedite claims, excuse me, flood claims, and don't await resolution of wind claims before you do that. So at most what we have here is a scientific dispute developed, admittedly, by Dr. Sunow, their expert, two years after the adjustment, and the case law in the Fifth Circuit is legion that scientific disputes do not rise to the level of a knowing violation and don't state a claim for sin or under the False Claims Act. It's not scientific evidence that, you know, someone who went and did a report got called and basically got fired, and the whole engineering firm got fired by State Farm because State Farm didn't like the outcome. They used a different software. There's evidence that they misled even one of your own experts about the line items. I mean, even forgetting this testimony, given that we have to find and review the jury verdict in favor of the prevailing party in drawing any inferences, I mean, it seems to me, why isn't there lots of evidence that, even aside from the expert testimony, that there was a desire on State Farm's part to classify as much as it could as flood damage? Well, Your Honor, if the Court would look at the demonstrative chart that I prepared, you will see that the decision to make the payment was done on October 2. It's undisputed only Mr. Consor, Mr. Perry, and Ms. Rigsby, the relator, were involved. The engineering reports, to which Your Honor refers, didn't even come out until the 17th. Go back in the mic. I mean, stay over. My apologies. Didn't even come out until the 12th, and then later on the 20th. And Ms. King, who received those reports, it's undisputed, played no role in the adjustment or approval of the flood claim. So whatever relevance they may have had to her scienter, which could have been relevant to a reverse false claim, something they did plead and lost on summary judgment and have not appealed, so it's not before the Court today, cannot be evidence of scienter on October 2. But State Farm's the defendant. Mr. Consor's not the defendant. And in looking at whether State Farm is presenting a false claim, why aren't we able to look at the intent of everyone at State Farm involved in this process, including Ms. King, who's one of the leaders of this whole claims process on the Gulf Coast? Because, Your Honor, she was not involved in the process at all on this claim, and there's no proof of that to the contrary. In fact, she didn't even know about the flood claim until weeks after it had been paid. The McIntosh claim. Correct. The McIntosh claim. So focusing on October 2 on the only three individuals involved, one of whom is the relator, in order to affirm, first this Court would have to find that there can be adequate guilty knowledge when the relator herself adjusted the loss and testified that she thought for certain the damage was more than $250,000. We have a fully tried jury case. I don't see any huge evidentiary issues other than about the expert and about Daubert. We don't have any assertion that there are some irregular jury instructions that sent the jury down a rabbit trail or whatever. If we have a fully tried jury case to which State Farm traverses the evidence, we don't have argued legal error vis-a-vis jury instructions, we don't have any issues about the verdict form itself, we have the arguments you're making at State Farm made vigorously to a jury. Coming back to the point Judge Costa asked you, notwithstanding the fervor of your argument on behalf of State Farm, what is it that would make us, on the standard of view we have, find there was some miscarriage of justice. In other words, admittedly, the inferences the jury drew, State Farm understandably doesn't agree with, but just stepping back from it, what's different about this than many jury trials in which all the evidence goes for, we don't have the facts as such that we would overturn the jury verdict based on either error of law or whatever. That's what I'm saying. Are you pointing us, trying to point to us that there was some missing evidence or something else or just making the evidence that the jury came to the wrong conclusion? Correct, Your Honor. Let me briefly finish on this then, obviously with five minutes left. All right. In Taylor v. Smith, Wright v. Comstock, Farmer v. City of Houston, and the Folliard case from the District Court of the District of Columbia, Circuit of Appeals, all three have said that when there's inadequate evidence of CNR at the time the claim is paid by the only individuals who are the decision matters, that is not enough to establish CNR. So, let me move on real quickly. Let me ask one quick question about your timeline you've given us. You said October 2nd State Farm paid the flood policy claim to the McIntoshes. Is that the same date they submitted it to the government for reimbursement, the way the flood program works, or did that happen later? Well, let me tell you what happened at trial on that. The Rigsby's did not offer proof of presentment of any date. The District Court concluded, based on both a federal regulation and a number of Fifth Circuit cases, which I can cite to you, that hold that in the context of federal flood payments, the time the claim is paid is a direct charge on the federal fisc. Neither party has challenged that finding on appeal, and so we have all proceeded on this appeal on the assumption that that was a correct finding. If the Rigsby's had believed differently, they could have challenged it. They didn't, and State Farm has not challenged it either. Now, let me move on real quick to the discovery issue because I know that there was a lot of time spent on that by Mr. Copley. The standard here is clearly abuse of discretion. This is a Rule 26 order about whether they should get post-trial discovery. But the District Court's order is based almost entirely on the Rule 9 standard in Grubbs, and I think our case law says that even when you're under abuse of discretion, doesn't it say that if you apply the wrong legal standard, that is an abuse of discretion? So doesn't it really all come back to whether Grubbs was correctly applied? And I know you think it was, but it seems to me, why isn't that the issue? Let me provide a couple of answers to that. Well, first of all, Grubbs says in our quote, we emphasize that we decide only that the allegations are sufficient to gain Dr. Grubbs' access to the discovery process. We leave to the able District Court to manage this access. Discovery targeted the claims alleged, avoiding a search for new claims. But here's what's real important, and we haven't heard anything about this from Mr. Copley and the Rigsby's. In Grubbs, the decision explicitly said there had been no qualifying public disclosure. And so the jurisdictional original source analysis did not have to be considered in the context of whether Rule 9b had been satisfied. And we know that Federal Rule of Civil Procedure 82 says that these rules cannot be used to subtract or add to federal jurisdiction. And so that means that in order for the Rigsby's, let's assume for the sake of argument that they satisfied 9b under Grubbs. Okay. And assume, contrary to what the District Court found, that they did submit reliable indicia that additional claims were submitted. Under Rockwell and Reagan from this court, we still have to do an original source analysis as to those claims that they admit they can't plead, never even moved to amend, need discovery to discover. They're not original sources to them, so even a perfectly pled 9b claim under Grubbs doesn't get them there. So that's why Grubbs doesn't help them. Further, I would point to the correct finding to the District Court, and this is a quote from his opinion. He says, Grubbs requires more than simply adequately pleading the existence of a scheme in one specific claim. Information which would support the strong inference that other claims were actually submitted is also necessary. And think about this. Well, that's where you get the indicia of fraud. And here, I mean, everything that came out at trial, the use of the computer software, the coercion of the engineering reports, King's general statement that this is all flood damage, why would that be related to just the one? As you said, King had no real significant involvement in the McIntosh claim, so why would all that evidence, which even forgetting the trial at the pleading stage we certainly have to accept is true, why would all that evidence not lead to the view that it was more systematic fraud? I mean, one claim, as I said, it means nothing to State Farm. A couple hundred thousand dollars, why do all this? Why get engineers fired? Why make this general statement to everyone about it being one claim? Why use an entirely different software all for one McIntosh claim? Thank you for asking that. In fact, I know that Chief Judge Stewart and Judge Southwick have done a lot of writing on original source and public disclosure. So let's talk for just a second about Rockwell and how it applies to this case. But what about the 9B standard? I know there's this original source issue, but on the 9B, why doesn't that meet the indicia of fraud that would lead to a plausible view that there must be other claims where the same thing happened? I would like to address in Rockwell, and here's why. So it's an original source reason. It's more than that, Your Honor, and here's what it is. Rockwell teaches that subject matter jurisdiction for a relator must be tested at every point. The original complaint and what was disclosed to the government, any amendments to it, the pre-trial order, and then what was actually pursued at trial. And in Rockwell, the court assumed that up to the point of the pre-trial order, they had original source status. But then in the pre-trial order, the theory changes. In other words, it's not the failure of the piping system to produce solid concrete. It's the fact that there's a different cement sludge ratio. And the Supreme Court said that's not what you disclosed to the government. That's not what you pled. You lost your original source status. Now here Mr. Robinson, one of the things that Rockwell does say, it seems to me takes back a little bit from that, is that the relator in Rockwell was predicting what was going to happen in the future. He didn't know, but for some reason he thought the mechanics of how this process worked would not actually produce a solid. The prediction that this process would lead to an insolid result does not qualify as direct and independent knowledge. Of course, a key terms relate towards misunderstanding of why a concealed effect occurred would normally be immaterial. So it seems to me that what you at most have argued here is that particularly on the McIntosh claim, or specifically on the McIntosh claim, this warping that occurred, if I may not be quite remembering what the word is, racking that occurred, is not what they were predicting back when they filed the false claim. But they were properly under Rockwell saying that this is forcing claims that are really caused by wind into flood and all the evidence that Judge Costa has been talking about. So why doesn't this statement from Rockwell is you don't need to know the exact reason something happened if you identify the defect. And the defect here is trying to force everything into flood damage. Well, then that takes us back to Cox, Comer, and the Hunter testimony. And in the quick trigger, in the Freed case, which I know the court is very familiar with, all we have to have is the breadth of the publicly disclosed allegations to be enough to have the quick trigger for the original source rule. And we know that minor details added aren't enough to qualify you as an original source. So let's look at what was alleged all the way through versus what was proved. The Rigsby's alleged this as a misvaluation case. In other words, we have told adjusters it's a water storm, take this evaluation tool, exact total, and if the damages don't hit the limits of the policy, run it again and again by changing the inputs until it does. And so then you're going to have what should have been paid as wind damage paid as flood damage. So it was a valuation fraud scheme. At trial, their witness who testified, excuse me, who submitted summary judgment evidence that there was flood damage of 130,000, they chose not to call it. Instead, they switched horses, relied on a causation expert, Dr. Sinnoh, who admitted on the stand he was not competent to offer valuation testimony as to the flood or the wind damage, and admitted there was flood damage, and opined that in a theory that he developed in 2007, two years after the adjustment, so it necessarily could not have been revealed to the federal government or pled in their complaint, caused a total loss to the House, even though he said he wasn't competent to value that loss. That is, Your Honor, Judge Southwick, very similar to what you just described in Rockwell. And, in fact, it shows that they have not submitted any strong indicia that additional claims were submitted. In fact, here's what they submitted. They gave the court 18 amended engineering reports obtained from a co-defendant. Well, the court looked at them, and I won't, because we don't have enough time, go through why each 18 was not reliable indicia of anything, but in the brief, we go in great detail. A bunch of them changed the conclusion from water to wind. Many of them weren't even ever provided to State Farm. Some of them didn't even have a State Farm-issued SFIP policy. So that's all they had. And don't forget, the Rigsby's saw hundreds of claims in the course of their adjustment for Katrina. They interacted daily with other adjusters. And for months, with Dickey Scruggs sitting over their shoulder, they surreptitiously rifled through State Farm systems looking for anything and everything they could of additional claims. And what did they find? Mullins, which didn't even have a FOIA policy, and McIntosh. They turned over everything that they downloaded unlawfully to the U.S. Attorney's Office, who declined to intervene. And so what did they get in discovery? And I think, Judge Costa, you asked this question, so I'd like to answer it directly. They got 51 depositions, 1,226 photos produced, tens of thousands of documents produced. And despite all this, they still couldn't, and despite the Dickey Scruggs and their unlawful access, they still couldn't come up with anything other than Mullins and McIntosh. And Mullins didn't even have FOIA policy. Well, let me tell you, just from my recent district court perspective, this is what seems a little odd about the way this proceeded below, and let me get your reaction. The reason you have a bellwether trial is because, oh, wow, plaintiffs, you want to open up this enormous case alleging fraud throughout this whole program, and that's going to be some huge case. You know what? Before we go through all that trouble and expense for everyone, let's see if there's anything to this. I mean, let's have a bellwether. Let's see if you've really got any meat on the bones. So you have the bellwether, and they win. I mean, so they did the best they could. They won. They got everything they wanted at trial. And then the new district judge says, no, we're shutting down the rest of the case. I mean, the bellwether, they won, and they didn't get in any better position for the rest of the case. It just strikes me as odd, and maybe it's a result of the fact that the district court judge changed during this process. But usually when you win a bellwether, that does open up the door to further discovery and a second trial eventually. So explain to me why that shouldn't be the case here. Well, I can tell you first what the district judge said. And, of course, at the time he wrote this, Judge Sinner had retired and I think was deceased. But Judge Sinner's order just said, I want this specific information in camera so I may determine the outer limits of potential claims here. He did not say I'm going to allow discovery into them or allow them to go to trial. That's all he said. And so that's all we can know about what he was thinking. Judge Osherden, in his Rule 50 opinion, pointed out exactly what I just said and said and found he never said you were going to get to try anything beyond this. I've now, as the district judge who has the right to reevaluate all the evidence, who sat through a two-and-a-half-week trial, reviewed all the pleadings, looked at the evidence that they've sought to submit that was supposedly the reliable indicia that there were additional claims, and I found there's not any. And on top of that, the theory they pursued at trial had nothing to do with what they pled. Exact total is a valuation tool, just like a stick build is. It's just two different versions. It has nothing to do with Carrie Rigsby's and Cody Perry's and John Consor's supposed knowing inability to discover what their own experts said was latent racking, causing a total loss of wind before the floodwaters arrived that he said he didn't develop until two years later and said that 90% of adjusters wouldn't have been able to see it until the house was deconstructed as part of the reconstruction process. So the theory they pursued, which is under Rockwell what we have to look at, gives no reliable indicia that there was anything further to pursue, and Judge Sinner's original order made no commitment as to what he would do after McIntosh, and Judge Osherden, with the authority to do it as the new judge, looked at the applicable standards, and using his Rule 26 discretion, said there's nothing left. There's nothing left. In fact, the order they've appealed didn't dismiss any claims. And if they were original sources of any additional claims, they could have moved relief to amend. They never did, not once. And the reason they didn't is because they don't have personal knowledge of any additional claims. And going back again to Grubbs, because Grubbs did not have a public disclosure, the court there didn't have to look to Russell, which is cited in Grubbs, and to Rule 82, which says, okay, if it's a pure 9B pleading standard, that's one thing under Grubbs. Okay? But now where we have a jurisdictional standard under the key TAM jurisdictional limits for relators, Rule 82 shuts that down. If they are not original sources as to something else, and we know they're not because they couldn't identify them. We only get to original source. I mean, first you have to show a public disclosure, and then there's essentially this exception if they're original source. And as I understand it, is your entire public disclosure argument based on the fact there was one bit of congressional testimony that just said there's fraud in the flood program. Didn't name any particular insurers. And then there were maybe two civil lawsuits against a host of insurance companies that had a couple sentences indicating there might have been fraud. But no specifics about what software is being used. No one specifically targeting State Farm. I think the public disclosure has to be substantially similar to what's then alleged in the key TAM suit. Why were there enough specifics in these, at most, a few sentences of public disclosure to invoke that bar? Let's go back to the suit you mentioned. It's actually one suit that changed names. We call it Cox Coma. State Farm was named as a defendant.  State Farm was named and specifically accused of shifting covered wind damage onto the flood program. It was a sentence or two, though, right, the allegation? How detailed was it? Wasn't it just a sentence or two? Did it identify the McIntosh house by name? No. Did it identify Kerry Rigsby as a supposed insider? No. But under Freed of this court and other decisions, the breadth and scope of the allegations is all that has to be matched. What about Little? I'm sorry. What about the Little decision, which I think is one of my colleagues' decisions on applying substantially similar? May I offer this as my time is about to run out? Let's assume their theory. Okay. Let's assume that it was not a qualifying public disclosure, even though State Farm was named and the same general supposed fraudulent scheme was pled. Under their theory, then, when post the Hunter testimony in Congress, we know there was an audit done by GAO of this allegation, okay, and it found it to be unsubstantiated. Let's say the opposite had happened, and this is all in the record. Let's say it had found widespread practices consistent with what they've alleged. Under the Rigsby's theory, they would get a piece of every single instance that GAO found across the whole coast, even though they had no personal knowledge of the ones adjusted by Aetna, of the ones adjusted by USAA, or, for that matter, any of the other ones adjusted by State Farm, which, if they had had personal knowledge of, they would have moved for leave to amend, and they didn't. So the final thing I'd like to address very quickly here, and I would urge the Court to look again at Rockwell and consider the fact that the theory that they disclosed to the government and they pled all related to post-claim evidence, which was only relevant to a reverse false claim. They lost that ultimate judgment. They didn't appeal it. We have to look to October 2. There's no evidence of guilty knowledge then. Ms. Rigsby said she believed it. Mr. Perry said he believed it. Mr. Contra said he believed it. FEMA officials with no obligation to do so traveled with the government's permission to trial, and they testified with unanimity that this claim was adjusted properly, that they believed it was a correct claim, and that even if they had reviewed the Ford and Kelly reports, it would not have changed their conclusion. They have, in their pleadings, pled a regulatory violation case, which we know, regulatory violations alone, particularly from Farmer, which was also a construction-related case, are not evidence of falsity or scienter. Your Honor, does the Court have any other questions? No, sir. I believe you've covered a lot of ground. We appreciate your argument, and, of course, the briefing goes in more detail on the points. All right. We're back to Mr. Copley on rebuttal. Thank you, Mr. Robinson. Thank you, Your Honor. It's just a few points. Let me touch briefly on the original source issue. I believe, Judge Costa, you're right that Judge Southwick's decision in Little is very instructive on this issue. The standards that were laid out there was that for a public disclosure to be qualifying, it has to, at an irreducible minimum, disclose evidence of the actual violation. Judge Costa, as you noted, in Cox Comer, there was no evidence. There was not a single allegation of fact to support the broad allegation that was made, and so it doesn't come close to meeting the standard this Court set out. I'd also like to turn back now to addressing the Grubbs issue and Rule 9b. Judge Costa, I think you were absolutely right when you said it doesn't really matter whether or not we look at this as the dismissal of a claim under Grubbs or a discovery ruling because either way the question still is did the Court get Rule 9b wrong and Grubbs wrong when it made its ruling, and that is a decision this Court cannot defer to the district court on. This Court has to decide what Grubbs means. And, Your Honor, one thing I would like to point out is that when you compare this Court to Grubbs, we have much more than they had in Grubbs. Grubbs had a single paragraph for each doctor that led about an overt act. That on a specific day there was one face-to-face meeting that didn't happen. We have an entire trial. We have a jury verdict. We proved with actual evidence that State Farm committed this act. Additionally, Your Honors, the scheme that would need to be applicable, as you're arguing, to a broader range, was that a necessary determination by the jury? It seems to me what the jury needed to decide is whether it was a false claim as to McIntosh, which gets into the purpose for exemplar bellwether trials, but you didn't give any special interrogatories to the jury. There's a jury verdict form. Are you saying the jury necessarily had to find a scheme in order to award the money to McIntosh, or was it sufficient to find that they knew it was wind damage as to McIntosh and called it flood? Your Honor, that's a fair question. What the jury had to find was scienter. It had to find that State Farm was at least reckless as to McIntosh. And so then the question is what was the evidence of that? The evidence of that was the instructions that Leckie King gave to Cary Rigsby and to every other adjuster. It was the protocol that State Farm put in place for adjusting these claims. It wasn't just Cary Rigsby and the McIntosh House. The case had the very specific matter of the Ford report, firing of the individuals of Ford himself, the substitution of a new report. So this seems to me there is both very focused evidence as to McIntosh that the jury alone may have relied on, and then you have this other evidence you're talking about. Well, you don't have much time, but it does seem to me that is a question here. Well, and, Your Honor, I would point to other evidence, though. For example, you had the protocol that they were told to employ, which was it's not your job to try to figure out whether or not wind or flood destroyed this home because we're going to send an engineer after the fact. Then what did State Farm do? You just heard the defense. State Farm paid the claim before the engineer got there, despite the fact they told their adjuster that they didn't have to determine whether or not wind or flood because the engineer was going to do it. They told the adjuster just run exact total, which doesn't do anything to document whether or not wind or flood caused damage to a home. It just gives you a value of the home based on location, build quality, and square footage. They just ran that, compared it to the figure in the NFIP flood policy, and said if it's more, you hit the limits of the flood policy, but don't worry. We're going to send an engineer after the fact. Then they paid the claim before they even got the engineering report, and when the engineering report came back, they said that they had the engineer fired. They buried the engineering report under a note that says do not pay, do not discuss. They fired the engineering firm, and they only allowed them to come back if they agreed to give them a different report with a different conclusion. Your Honor, while that may have been about the McIntosh house, the state of mind, the effect of the mindset, what was going on by the decision makers, by State Farm in adjusting these claims, certainly has broader application. It wasn't like Leckie King only objected to engineering reports that say wind when they involved the McIntosh house. It goes to the state of mind of the decision makers, and when you combine that with the overall protocol that State Farm put in place, that Leckie King mandated for how these adjusters were supposed to go about this, which excluded a determination by the adjusters on the house as to whether or not flood or wind caused the home. We believe that that was more than sufficient. What about the argument, and this sort of goes to the timing, but that CONSERV did not have the fraudulent intent, and all this stuff that happened after the submission or the payment of the claim couldn't have been relevant to intent? That argument is irreconcilable with the plain language of the False Claims Act, first of all. Section 3729A1. I see my time is up. May I finish answering your question? Section 3729A1 specifically states that it prohibits submission of a claim for payment or approval. State Farm has to turn over its files once every three years for approval from the government, so the fact that what CONSERV knew or had in the file on the date of payment doesn't matter. It's also, Your Honor, I would point out that that argument ignores the role that engineers played in the scheme. The fact—because State Farm told its engineers they didn't need to make the determinations whether or not wind or flood caused the damage to the home, the fact that State Farm paid the claim before even getting the engineer report is not a defense. It's a damaging admission given the False Claims Act's recklessness and deliberate ignorance standards. I thank this Court for its consideration, and I— Before you leave the podium, I'll ask you another question on our time. I don't remember in my notes if we asked you about the ceiling matter because we were going through, you know, all the other matters in back, but just to complete the record, so to speak, the government's saying there's amicus, not with a thumb on a scale in terms of the outcome here, but basically wanting us not to stretch out the discovery piece. So because you hadn't been asked about it, and I'm curious, can you succinctly speak to the ceiling violation issue? Basically, is there a concession of violation but, like, no harm or what? Yes, Your Honor, and I'll do this within the framework that Luan set out because I believe that's the correct framework the Court should employ. There was sufficient evidence that Dickey Scruggs sent the evidentiary disclosure in this case to a few members of the media. However, the important point for the Court to understand is those members of the media never reported publicly the existence of the lawsuit. They only talked about the underlying facts of State Farm's conduct. It was for a story about Dickey Scruggs and the claims he was bringing on behalf of hundreds of other policyholders against State Farm. So there was never actually a disclosure of the existence of this lawsuit to the general public and, therefore, to State Farm. Does that mean it was a violation but no harm? Exactly, Your Honor. That's exactly right. There was absolutely no harm to the government because it was never publicly disclosed. The second point that I would make, Your Honor, is that with respect to willfulness, there was no finding that my clients were knowingly involved in that disclosure. Richard Scruggs at the time was representing hundreds of other policyholders, and when he made that disclosure, the Court even talked about how he was engaged in a media campaign to help the other policyholders. There's no indication that he was doing it for the Rigsby's when he made that disclosure. In fact, if anything, he was sacrificing their interests. He wasn't acting for their interests. And as a result, the ultimate resolution in this case, where Dickey Scruggs was disqualified from this case and the others, but the Rigsby's were allowed to continue their claims, is perfectly in line with this Court's precedence, saying that when you have a willful misconduct by an attorney and an innocent client, dismissal ordinarily is not the appropriate remedy. Okay. I think that may have been the only other area that we didn't touch, but we're not in a hurry. It's a big case, and you're all the way from Washington. We want you to get your money's worth here. Other questions? Judge Suffolk? None? All right. Thank you. And thank you to all counsel for the briefing. It's an interesting case, to put it mildly, but we'll trudge through the briefing, and in due course, we'll decide it. Thank you, Your Honor, for your consideration. Thank you, sir. All right.